**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ALASKA**

| | |
|---|---|
| EMILY ACKER and JUSTIN ACKER, individually, and as natural parents and next friend of I.A., a minor child, | No. 3:23-CV-00130-SHR |
| | **ORDER** |
| Plaintiffs, | |
| v. | |
| UNITED STATES OF AMERICA, | |
| Defendant. | |

Plaintiffs Emily Acker ("Emily") and Justin Acker ("Justin"), individually, and as natural parents and next friend of I.A., filed a medical malpractice action against the United States of America under the Federal Tort Claims Act (FTCA). I.A. is a female child who was born and received medical care at Bassett Army Community Hospital at Fort Wainwright in Fairbanks, Alaska ("Bassett"), a facility operated by Defendant. Plaintiffs allege medical practitioners at Bassett breached the applicable standards of care related to Emily's labor and I.A.'s delivery, causing I.A. to suffer a skull fracture and permanent brain injury. After a thirteen-day bench trial and consideration of the witnesses' testimony, the exhibits admitted into evidence, and the memoranda submitted by the parties, the Court makes the following findings of fact and conclusions of law pursuant to Federal Rule of Civil

Procedure 52.[1]

## I. OVERVIEW

The allegations in this case are directed at how Certified Nurse Midwife (CNM) Brittany Speers and a doctor she later called to assist, Dr. Tess Harmon, managed Emily's second stage of labor and performed her cesarean section ("C-section"). The case involves significant injuries to a newborn child, I.A. The parties dispute whether those injuries occurred during labor and delivery of I.A. or were sustained from accidental or nonaccidental trauma occurring after discharge from Bassett. Both parties offered extensive expert testimony regarding the applicable standards of care and causation. Experts for both parties were exceptional in their training and experience in their areas of expertise; however, they offer diametrically opposed opinions as to what the medical records indicate regarding I.A.'s injuries. In general, Plaintiffs' experts opine the medical records show I.A.'s injuries, including a comminuted skull fracture and resulting brain injury, were caused by Dr. Harmon in performing the C-section, whereas Defendant's experts read the same medical records to conclude I.A.'s injuries occurred after she was discharged from the hospital and were likely caused by nonaccidental trauma.

---

[1] The Court departs from the more traditional format consisting of numbered paragraphs because the issues in this case lend themselves to a narrative format. The Court's resolution of relevant contested issues is controlling whether stated in the Findings of Fact or Conclusions of Law sections herein. *In re Bubble Up Del., Inc.*, 684 F.2d 1259, 1262 (9th Cir. 1982) ("The fact that a court labels determinations 'Findings of Fact' does not make them so if they are in reality conclusions of law."). The Court makes its findings of fact by a preponderance of the credible evidence. This Order does not purport to recite all of the arguments made and evidence submitted by the parties. *See* Fed. R. Civ. P. 52(a) Advisory Committee Note to 1946 Amendment ("[T]he judge need only make brief, definite, pertinent findings and conclusions upon the contested matters; there is no necessity for over-elaboration of detail or particularization of facts."). And, while this Order contains some citations to evidence, the Court has not attempted to recite all supportive citations in the record.

## II.  FINDINGS OF FACT

### a.  Labor & Delivery at Bassett

At approximately 11:00 p.m. on December 11, 2020, following an uncomplicated pregnancy, Emily's water broke and she was admitted to the labor and delivery unit at Bassett.  Soon after her admission, Emily provided doctors with a handwritten birth plan describing her preferences for her daughter I.A.'s birth. (D-116.)  Emily's birth plan stated she only wanted to push when she felt the instinct to do so rather than when healthcare providers told her to push. Throughout the early morning hours of December 12, Emily was in the first stage of labor, meaning her cervix was progressively dilating as she was having contractions.  Emily was given an epidural to relieve pain from contractions.

### i.  Second Stage of Labor

From approximately 7:00 a.m. until 12:00 p.m. on December 12, CNM Speers managed Emily's labor.  (D-1 at 7–8.)  When CNM Speers initially performed a vaginal examination at 7:45 a.m., she determined Emily's cervix was fully dilated, indicating she had progressed to the second stage of labor and it was therefore time for her to push.  Emily stated she did not feel the instinct to push and declined to do so.  Because instinctive pushing was part of Emily's birth plan, CNM Speers advised Emily she could "labor down," meaning she could wait for about an hour before beginning to push, allowing time for I.A. to naturally descend into Emily's birth canal.  (Doc. 113 at 101; Doc. 120 at 10–11.)  At this time, I.A.'s head was at a +1 station, meaning her head had just begun to engage in Emily's pelvis.[2]  Approximately one hour later, CNM Speers told Emily she needed to begin pushing, and Emily again indicated she did not feel the instinct to push.

---

[2] Fetal station refers to the position of a baby's head as it descends into the pelvis during labor and is measured on a scale -5 to +5, with -5 indicating the baby's head is high and not yet engaged in the pelvis and +5 indicating the head is at the lowest point and ready for delivery.  A +1 station indicates the top of the baby's head is one centimeter below the ischial spines, which are bony protrusions marking the narrowest part of the pelvis.

Nevertheless, Emily began pushing at 9:06 a.m.

After 40 minutes of pushing, CNM Speers performed another vaginal exam, during which she determined I.A. was in the occiput posterior position ("OP position"), meaning the back of I.A.'s head was facing Emily's spine. While the OP position is considered a "malposition" for vaginal delivery, it is not a contraindication for continued labor and vaginal delivery. CNM Speers ordered two milliunits of Pitocin to strengthen Emily's contractions.[3] Emily continued pushing until approximately 11:30 a.m. At that time, CNM Speers requested a consultation with Dr. Harmon—the on-call obstetrician that day—to discuss Emily's progress and the possibility of rotating I.A. to a more ideal birthing position. (D-1 at 7.)

Dr. Harmon arrived at Bassett around noon. After examining Emily, she determined I.A.'s head, which CNM Speers had previously determined was in the OP position, had rotated to the right occiput anterior position ("ROA position"), a better position for vaginal delivery. (D-1 at 9.) Despite Emily having been fully dilated since 7:45 a.m. and pushing on and off since approximately 9:00 a.m., I.A.'s head was not descending in Emily's birth canal and remained at a +1 station. Dr. Harmon informed Emily she met the criteria to proceed with delivery by C-section based on her lack of progress, but Emily instead opted to push for an additional 20 minutes. After 20 minutes, Dr. Harmon recommended delivering I.A. by C-section and Emily agreed. Dr. Harmon stopped administering Pitocin to Emily at 12:30 p.m. Thereafter, hospital staff began preparing for the C-section by having Emily sign a consent form, calling on additional staff, and transferring Emily to the operating room. The Court finds the second stage of labor, in total, lasted for approximately 6.5 hours, from approximately 7:45 a.m. to 1:30 p.m. Additionally, the Court finds Emily's maximum duration of pushing, excluding breaks, did not

---

[3] Pitocin is a synthetic form of oxytocin, the hormone the brain makes to cause the uterus to contract. The use of Pitocin is designed to increase the frequency and strength of uterine contractions.

exceed three hours.  (P-3 at 27–35.)

### ii. C-Section

At approximately 1:30 p.m., Dr. Harmon began performing the C-section, with CNM Speers as the first assistant.  Dr. Harmon made the skin incision at 2:04 p.m. and the uterine incision at 2:12 p.m.  Dr. Harmon delivered I.A. at 2:13 p.m., within one minute of making the uterine incision.  Contrary to Dr. Harmon's previous determination, I.A.'s head was in the OP position and her neck was extended, making delivery of her head challenging.[4]  (D-1 at 24.)  Once Dr. Harmon delivered the head, I.A.'s body delivered with ease.

Following I.A.'s delivery, Dr. Jessica Eiser, the pediatrician on staff at Bassett that day, assumed care of I.A.  She performed a quick evaluation and assigned I.A. an APGAR score of 9 one minute after she was born.[5]  (Doc. 132 at 33–34.)  She performed another evaluation five minutes after I.A. was born and again assigned I.A. an APGAR score of 9.  An APGAR score of nine is excellent.  (*Id.* at 34.)  Dr. Eiser noted I.A.'s appearance, pulse, grimace, activity level, and respirations were ideal.  (*Id.*)  After being assured I.A. did not have a critical condition requiring immediate attention, Dr. Eiser performed a full body examination.  Upon completion of this exam, she noted, among other things, I.A.

---

[4] This was the last observed fetal position of I.A.  The Court finds I.A. was never in a brow presentation.  Plaintiffs asserted at trial I.A. had been in a "malpresentation"—namely, a brow presentation—which, if assessed, would require delivery by C-section.  They based this argument on medical records indicating such a malpresentation was ultimately the reason for proceeding to a C-section.  (*See* P-3 at 15.)  However, both CNM Speers and Dr. Harmon testified they had performed vaginal exams during Emily's second stage of labor and I.A. was not in a brow presentation.  Consistent with Dr. Harmon's testimony on cross-examination, the Court finds the medical records indicating I.A. had been in a malpresentation inaccurate.

[5] An APGAR score is a measurement, on a scale of 1 to 10, of how well the baby tolerated the birthing process.  The score is assigned at one and five minutes after birth by the pediatrician following an assessment focusing on five key criteria: appearance, pulse, grimace, activity, and respiration.  (*See* Doc. 132 at 34.)

had "significant bruising" on her head and a small broken blood vessel in her right eye.  (*Id.* at 93.)

While Dr. Eiser evaluated I.A., Dr. Harmon turned her attention to completing Emily's surgery.  During the C-section, Emily sustained an extension—or tear—of the uterine incision into the cervix.  Dr. Harmon began repairing this tear and called another doctor to assist.  It took both doctors about three hours to repair the tear.

On December 13, 2020, I.A. underwent phototherapy at the hospital for elevated bilirubin levels.  On December 14, I.A.'s bilirubin levels began normalizing and Emily and I.A. were discharged from the hospital.  Just before discharge, Dr. Eiser performed a head-to-toe examination of I.A., during which she determined I.A. appeared healthy, was not lethargic, and was feeding normally.  Dr. Eiser also determined the bruising on I.A.'s head was resolving.  (Doc. 132 at 71–83.)

b.  Events After Discharge

Between December 15 and December 30, 2020, Emily and Justin took I.A. to two scheduled well-baby visits with Dr. Elias Hydrick, a family practice physician, to address general health concerns, including concerns regarding I.A.'s bilirubin levels and decrease in weight gain.  Dr. Hydrick monitored I.A.'s bilirubin levels, which had stabilized by the December 15 appointment, and referred Emily to a lactation consultant to address feeding concerns.  Dr. Hydrick did not find anything abnormal during either of his examinations and noted on December 30 that I.A. was feeding, voiding, and stooling appropriately for her age and the exam was "unremarkable."  (D-8 at 13.)

c.  I.A.'s Hospitalization on January 2, 2021

On January 2, 2021, Emily brought three-week-old I.A. to the emergency department at Bassett.  Over the previous two days, I.A. had been exhibiting concerning symptoms, including noticeable feeding difficulties, spitting up, and eye twitching.  (*See* D-9 at 6.)  Upon I.A.'s arrival, Dr. David Scolnick, the attending emergency room physician, obtained I.A.'s medical history from Emily and

examined I.A. Because I.A. was not demonstrating appropriate responses and was exhibiting signs of tremors or seizures, Dr. Scolnick determined I.A. needed to be admitted to the hospital. Dr. Scolnick then contacted the assigned on-call pediatrician for further evaluation. I.A. underwent blood testing, a lumbar puncture, and numerous imaging scans.

Once stabilized to some degree, the doctors at Bassett determined I.A. needed a higher level of care because, among other things, she had bleeding within her brain. A few hours after they arrived at the emergency room, I.A. and Emily flew on a medical transport flight from Fairbanks to Anchorage where I.A.'s care was transferred to Providence Alaska Medical Center ("Providence"). At Providence, doctors and healthcare professionals continued to care for I.A. I.A. was diagnosed with a comminuted skull fracture involving both sides of her parietal bone across the skull's suture line, bleeding within her brain, and permanent brain injury. I.A. was also diagnosed with rib and ulna fractures. A doctor in Providence's pediatric intensive care unit, suspecting I.A.'s injuries had been caused by nonaccidental trauma, alerted a doctor at Alaska Child Abuse Response and Evaluation Services, who diagnosed I.A.'s injuries as having been caused by nonaccidental trauma. (D-11 at 42.)

d. Treating Physician Testimony & Qualifications

At trial, Plaintiffs called **Dr. Tess Harmon**, the obstetrician who had delivered I.A., to testify in their case in chief. Dr. Harmon graduated residency in 2020, the same year she performed the C-section at issue. Over the course of her residency and post-training career, Dr. Harmon had performed over 200 C-sections at the time she performed Emily's C-section. Despite her current work in obstetrics, Dr. Harmon was not yet board certified in obstetrics and gynecology at the time of trial.

**CNM Brittany Speers**, who worked directly on Emily's labor and I.A.'s delivery, testified for the defense. CNM Speers is a registered nurse and has been

a certified nurse midwife for almost 19 years. Certified nurse midwives take care of women throughout their lives, providing pregnancy, labor, postpartum, and general gynecologic care.

The defense also called two doctors and one nurse to testify regarding I.A.'s condition when she presented at Bassett on January 2. **Dr. David Scolnick**, I.A.'s treating emergency room doctor, initially assessed I.A. and determined she needed to be hospitalized. Dr. Scolnick also consulted **Dr. Donia Blauvelt**, the on-call pediatrician, for further assistance in stabilizing and diagnosing I.A. Upon receiving Dr. Scolnick's call and arriving at the emergency room, Dr. Blauvelt assessed I.A., ordered various imaging studies, and performed a lumbar puncture. **Nurse Jasmine Edwards**, who was working at Bassett's emergency room when I.A. arrived, also observed I.A. and provided care.

The defense called three other physicians involved in evaluating or treating either Emily or I.A. **Dr. Jessica Eiser** was the pediatrician who first examined I.A. upon birth. As more fully detailed below, Dr. Eiser performed a thorough evaluation of I.A. soon after birth and in the two days post-birth before she was discharged from the hospital. **Dr. Ciara Rakestraw** assisted Dr. Harmon in repairing the tear in Emily's uterine incision. **Dr. Elias Hydrick** was the family practice physician who saw I.A. for well-baby visits on December 15 and 30.

e. Expert Witness Testimony & Qualifications[6]

i. *Plaintiffs' Experts*

**Dr. Martin Gubernick**, a board-certified obstetrician and gynecologist (OBGYN), testified regarding the standard of care for managing the second stage of labor. He has been practicing for nearly 40 years as an attending physician at

---

[6] Because the Court ultimately concludes Plaintiffs have failed to establish Defendant is responsible for I.A.'s injuries, it will not address the issue of damages. Therefore, while the Court appreciates the testimony of Dr. Judith L. Gooch, Helen Woodard, and Hugh Richards for Plaintiffs and Dr. Thomas G. Burns, John Fountaine, and Michael Chapman, PhD, for Defendant, the Court intentionally omits a discussion of those witnesses' testimony.

the New York Presbyterian Hospital-Weill Cornell Medical Center, a private-practice role, and simultaneously holds an academic position as a clinical instructor at Cornell Medical School. Dr. Gubernick's work is primarily focused on academia, including supervising residents, teaching students, and running training programs for continuing medical education. Dr. Gubernick spends 10% to 15% of his time on expert work and testifies for plaintiffs approximately 85% of the time.

**Dr. Barry Schifrin**, a board-certified obstetrician who holds a fellowship in perinatal biology, testified regarding the standard of care. Dr. Schifrin is a leading expert on fetal heartrate tracing. He has not treated patients or performed a C-section since 2011.

**Dr. Maureen Sims**, a board-certified pediatrician and neonatologist, testified regarding standard of care and causation. She serves in numerous consulting roles and consults equally for plaintiffs and defendants in her medicolegal work. Dr. Sims has an extensive background in reviewing alleged medical negligence and high-risk cases. Dr. Sims has not treated patients since 2009. Her recent experience focuses on academic and administrative roles.

**Dr. Stephen Glass**, a board-certified neurologist with special qualification in child neurology, testified regarding causation. He has practiced for over 45 years and currently has an outpatient practice in child neurology primarily focusing on children with developmental disorders. Dr. Glass devotes 98% of his consulting work to plaintiffs' cases and has not treated a newborn in over 13 years.

**Dr. Julie Mack**, a board-certified radiologist, testified regarding causation, particularly as it pertains to the timing of I.A.'s injuries and diagnosis. Dr. Mack has completed a fellowship in pediatric radiology and holds a certificate in pediatric radiology. Dr. Mack's clinical practice currently focuses on breast tissue imaging and has not focused on pediatric radiology in over 10 years. However, Dr. Mack applies her pediatric radiology qualifications in her work as a consulting expert in cases of suspected child abuse. As part of her consulting work on these cases,

Dr. Mack confirms or rejects diagnoses of nonaccidental trauma.

ii. *Defendant's Experts*[7]

**Dr. Brendan Carroll**, a board-certified OBGYN, testified regarding the standard of care, particularly as it pertains to Dr. Harmon's and CNM Speers' management of Emily's second stage of labor and C-section. Dr. Carroll is actively involved in clinical work and delivered a baby two days before providing his testimony in this case. He also works on quality improvement measures within his hospital, performing peer review of cases involving unexpected outcomes. In his medicolegal work, he testifies on behalf of plaintiffs approximately 60% of the time.

**Dr. Frank Manning**, a board-certified OBGYN and maternal-fetal physician, testified regarding the standard of care. Maternal-fetal medicine physicians work with OBGYNs and midwives to provide consultation and management of specific high-risk circumstances, both maternal and fetal. Dr. Manning's career entails a combination of teaching, research, and direct patient care. He also takes on temporary assignments, filling in for physicians in private practices across the country. Dr. Manning has served in academic roles, including overseeing 17,000 births per year at the University of Manitoba and teaching students across multiple institutions.

**Dr. Elizabeth Cook**, a CNM and Doctor of Nursing Practice (DNP) who has delivered over 3,000 babies, testified regarding the standard of care. Dr. Cook holds numerous degrees including a Bachelor of Science in Nursing, a Master of Science in Nursing, a Post-Master's certificate in women's health, and a DNP degree with a focus in midwifery. Dr. Cook is currently devoting the majority of her professional time to full-time, full-scope volunteer midwifery work in the Togolese

---

[7] Because the Court finds insufficient evidence establishing Emily or Justin inflicted nonaccidental trauma upon I.A., the Court intentionally omits an in-depth discussion of testimony of witnesses whose sole purpose was to discuss nonaccidental trauma, like Dr. Nichole Wallace, Defendant's child abuse pediatrician.

Republic in West Africa, where she assists in high-risk vaginal and cesarian deliveries. Dr. Cook has held academic positions involving teaching and supervising OBGYN resident physicians and medical, midwifery, doula, and nurse practitioner students.

**Dr. Gordon Sze**, a board-certified radiologist who has completed a fellowship in neuroradiology and holds a certificate in the same, testified regarding causation, particularly as it relates to the timing of I.A.'s injuries. Dr. Sze's work as a neuroradiologist involves using all available imaging methods to diagnose diseases of the brain, spine, and neck. Dr. Sze has been the chief of neuroradiology at Yale for 30 years.

**Dr. Courtney Wusthoff**, a board-certified pediatric neurologist, testified regarding causation. In addition to being board certified as a pediatric neurologist, she is separately boarded in epilepsy and clinical neurophysiology. She holds a certificate in neonatal neurocritical care focusing on neurologic conditions before birth and during the first 28 days of life. Dr. Wusthoff is a professor of neurology at the University of California, Davis and is the program director for the pediatric neurology residency there. Dr. Wusthoff was recruited to start the neurology neonatal intensive care unit (NICU) at Stanford, which she described as a unit focused on babies who have or are at risk for brain injuries within the NICU. After running that unit for approximately 12 years, Dr. Wusthoff moved to UC Davis to improve its child neurology program. Dr. Wusthoff spends 20% of her time in clinic, meaning she sees patients about one day per week. Additionally, some weeks during the year she will be "on service," meaning she is responsible for evaluating patients in the emergency department and ICU for seven days at a time, 24 hours per day. In her current role, Dr. Wusthoff oversees 12 neurologists, and her department has about 40 neonatal intensive care beds. Her research focuses on neonatal neurology, particularly looking at neonatal seizures caused by brain injuries. She also does clinical research in areas of neonatal and hypoxic-ischemic

encephalopathy.  She has published about 130 peer-reviewed articles in these areas.  Her work as an expert is split between plaintiffs and defendants.

**Dr. Jay Goldsmith**, a board-certified pediatrician and neonatologist, testified regarding causation, particularly the statistical likelihood of I.A.'s injuries having been sustained at birth.  Dr. Goldsmith was recruited to New Orleans to start the first NICU in the state of Louisiana in 1976.  Dr. Goldsmith retired in July 2025 but most recently held roles as a clinical professor at two universities and as a staff neonatologist at two hospitals, rotating through eight large NICUs and consulting with about 20 neonatologist colleagues.  Throughout his career, Dr. Goldsmith has worked at NICUs caring for the most critically ill newborns.

## III.    CONCLUSIONS OF LAW

Under the FTCA, the United States is liable for medical malpractice claims arising from the actions of its employees within the scope of their employment.  28 U.S.C. § 1346(b)(1); 28 U.S.C. § 2671.  It is undisputed Dr. Harmon and CNM Speers rendered medical care to Emily and I.A. and they were both employees of the United States acting within the scope of their authority during the relevant timeframe.  (*See* Doc. 1 ¶¶ 8–9, 12; Doc. 5 ¶¶ 8–9, 12; *see also* Doc. 85 at 2.) Therefore, it is undisputed the United States is responsible for the actions of these providers.  Additionally, Plaintiffs timely filed an administrative claim, which the United States subsequently denied.  (Doc. 1 ¶ 10; Doc. 5 ¶¶ 10–11.)  Accordingly, this Court has subject matter jurisdiction pursuant to 28 U.S.C. § 2671 *et seq.* and 28 U.S.C. § 1346(b)(1).

The FTCA incorporates state substantive law as to liability and damages. *See Bennett v. United States*, 44 F.4th 929, 933 (9th Cir. 2022).  As such, Alaska law applies to define the contours of Plaintiffs' claim:

> (a) In a malpractice action based on the negligence or wilful misconduct of a health care provider, the plaintiff has the burden of proving by a preponderance of the evidence
>
> (1) . . . the plaintiff had a health care provider-patient relationship with the defendant at the time of the

act complained of;

(2) the degree of knowledge or skill possessed or the degree of care ordinarily exercised under the circumstances, at the time of the act complained of, by health care providers in the field or specialty in which the defendant is practicing;

(3) . . . the defendant either lacked this degree of knowledge or skill or failed to exercise this degree of care; and

(4) . . . as a proximate result of this lack of knowledge or skill or the failure to exercise this degree of care, the plaintiff suffered injuries that would not otherwise have been incurred.

AS § 09.55.540. To summarize the requirements of the statute, a plaintiff must prove healthcare providers breached the applicable standard of care, causing an injury and inflicting damages.[8] Plaintiffs have the burden of proving each of their claims by a preponderance of the evidence, which means the Court must be persuaded by the evidence that the claim is more likely true than not.

At trial, Plaintiffs primarily asserted Dr. Harmon and CNM Speers mismanaged the second stage of Emily's labor and C-section, ultimately causing I.A.'s injuries.[9] For the following reasons, the Court finds neither Dr. Harmon nor CNM Speers fell below the standard of care in managing Emily's second stage of

---

[8] Under Alaska law, an expert witness who testifies regarding the appropriate standard of care in a professional negligence case must be specially qualified. AS § 09.20.185. The Court finds all experts who testified to the standard of care in this case were generally qualified as such under Alaska law. As discussed above, both parties' experts had extensive training and experience, although some experts were better aligned to opine on the relevant issues. Because of the difficulty of breaking ties in a complicated battle of the experts, the Court generally gives more weight to treating physician accounts when necessary to break such ties, and to experts who have had more recent or relevant experience.

[9] Although Plaintiffs initially appeared to assert an additional theory of causation—that I.A.'s injuries had been caused by a prolonged second stage of labor alone—they abandoned this theory at trial and instead indicated their only argument was that the prolonged second stage of labor, while not directly causing I.A.'s injuries, ultimately contributed to the severity of I.A.'s injuries sustained during the C-section. (Doc. 113 at 83, 98–99.)

labor or performing her C-section. Nevertheless, as discussed below, even if the Court were to find Dr. Harmon or CNM Speers fell below the standard of care, the Court finds any such breach was not the proximate cause of I.A.'s injuries.

a. <u>Breach</u>

Regarding breach of the applicable standards of care, Plaintiffs allege: (1) Dr. Harmon and CNM Speers should have curtailed Emily's second stage of labor and proceeded to a C-section by around 10:00 a.m.; (2) Dr. Harmon and CNM Speers should have used an ultrasound to confirm the position of I.A.'s head; (3) CNM Speers should not have administered Pitocin knowing I.A. was not in an ideal position for vaginal birth; and (4) Dr. Harmon improperly used excessive force when extracting I.A.'s head from Emily's pelvis during the C-section.

*i. Length of Second Stage of Labor*

As discussed, although CNM Speers recommended Emily begin pushing upon full dilation at 7:45 a.m., Emily did not begin pushing until 9:06 a.m., and Dr. Harmon made the first incision for the C-section at 2:04 p.m. Plaintiffs assert Dr. Harmon and CNM Speers should not have allowed Emily to spend 6.5 hours in the second stage of labor and instead should have performed a C-section sooner. On this issue, two publications were discussed at trial—(1) the American College of Obstetricians and Gynecologists and Society for Maternal-Fetal Medicine consensus on Safe Prevention of the Primary Cesarean Delivery (the "consensus") (D-150) and (2) a clinical practice guideline on the first and second stage of labor management, also published by the American College of Obstetricians and Gynecologists.

Dr. Gubernick and Dr. Schifrin were Plaintiffs' primary experts on CNM Speers' and Dr. Harmon's failure to properly manage the second stage of labor. Dr. Gubernick testified, under the circumstances present in this case, it was irresponsible for doctors to allow Emily to continue in the second stage of labor past 10:00 a.m. (Doc. 112 at 12.) Dr. Gubernick pointed to the fact that by 10:00

a.m., despite periods of pushing and contractions, I.A. had not made any further progress into the birth canal since Emily became fully dilated at 7:45 a.m. (*Id.* at 29–30.) As noted, medical records show I.A.'s head was at a +1 station at 7:45 a.m., meaning it was in Emily's pelvis and had not yet engaged in the birth canal. At 10:00 a.m., I.A. remained in the exact same position. He opined this lack of progress despite periods of pushing demonstrated I.A. was being pushed against Emily's pelvis with each contraction rather than descending into the birth canal. He testified allowing Emily to remain in the second stage of labor for 6.5 hours without further descent of I.A.'s head is an "unheard-of length of time."[10] (*Id.* at 113.) In reaching these conclusions, Dr. Gubernick largely relied on recommendations set forth in the 2024 clinical practice guideline on the first and second stage of labor management. Additionally, Dr. Schifrin testified I.A.'s heartrate tracings indicated this lack of progress and being pushed against Emily's pelvis was causing I.A. distress. (Doc. 120 at 66–67.) Ultimately, these experts opined I.A.'s lack of descent and indications of fetal distress on heartrate tracings should have alerted CNM Speers and Dr. Harmon to perform a C-section at around 10:00 a.m. and failure to do so was a breach of the standard of care.

For the defense, Dr. Cook, Dr. Carroll, and Dr. Manning all concluded CNM Speers and Dr. Harmon had not prolonged the second stage of Emily's labor in a manner that caused any danger to I.A. Dr. Cook specifically relied on the consensus when discussing the parameters for duration of labor. According to her testimony, the consensus advises obstetrics providers should judge the duration of pushing, not the duration of the entire second stage of labor. She explained two hours is the minimum amount of time to be considered prolonged pushing for a

---

[10] To the extent Plaintiffs argue CNM Speers fell below the standard of care by not proceeding to a C-section after a failed attempt to rotate I.A., the Court finds no such attempted rotation ever occurred and CNM Speers did not breach the standard of care by allowing Emily to continue pushing after observing I.A. in the OP position.

multiparous woman.[11]  The three defense experts explained there is no definitive maximum duration of the second stage of labor according to their own clinical knowledge and the parameters set forth by the consensus.  The consensus also explains pushing time can be increased if an epidural is given, which occurred in this case.  Dr. Carroll noted Dr. Harmon had acted reasonably to balance the risks of a prolonged second stage with Emily's preference for vaginal delivery and instinctive pushing.  And Dr. Manning explained metrics other than descent can be used to assess progress, such as whether the baby is rotating and the strength of the mother's contractions.  (Doc. 116 at 82, 88–89.)

The Court finds Defendant's experts' accounts of a multifactor approach to safety within the second stage of labor more plausible than Plaintiffs' experts' accounts, which focus primarily on the fact Emily spent a total of 6.5 hours in the second stage of labor without I.A. descending past a +1 station.  Dr. Gubernick focused on I.A.'s lack of descent as the primary indicator of when to curtail the second stage of labor without evaluating other considerations as allowed by the guidelines in effect at the time of I.A.'s birth, such as the fact Emily was given an epidural and Dr. Harmon determined during her manual evaluation I.A. had rotated to a more ideal position after two hours of pushing.  Dr. Gubernick relied on recommendations in the clinical practice guideline on the first and second stage of labor management from 2024 and those guidelines could not have reflected the standard of care when I.A. was born in 2020.

Similarly, Dr. Schifrin generally opined that allowing the second stage of labor to continue for 6.5 hours fell below the standard of care but appeared to reach this conclusion by assuming Emily was pushing for the entire 6.5-hour period. Numerous treating providers and experts testified the length of time spent in the second stage of labor alone is not associated with worse outcomes for mothers or

---

[11] A multiparous woman is one who, like Emily, has previously given birth vaginally or by C-section.

babies, and Dr. Schifrin conceded on cross-examination Emily did not spend the entire 6.5 hours actively pushing. (Doc. 120 at 28.) Emily only pushed for a total of approximately three hours and the remaining time was spent either laboring down before beginning to push or taking breaks from actively pushing. Dr. Schifrin testified he had no concerns with CNM Speers allowing Emily to labor down. (*Id.* at 10–11.) CNM Speers consulted with Dr. Harmon regarding Emily's lack of progress after only two hours of pushing, the minimum amount of time to be considered prolonged pushing. (Doc. 117 at 18; D-1 at 7.) And Dr. Schifrin's testimony regarding I.A.'s heartrate at the beginning of Emily's second stage of labor does not account for I.A.'s heartrate tracings at the time of Dr. Harmon's evaluation, which, according to Dr. Harmon's testimony, did not indicate fetal distress.

In sum, CNM Speers consulted with Dr. Harmon as soon as Emily entered into what medical literature considers to be prolonged pushing. After conducting a manual evaluation to determine I.A.'s position, Dr. Harmon recommended proceeding to a C-section. Per Emily's request, Dr. Harmon allowed her to continue pushing for an additional 20 minutes, after which Dr. Harmon began preparing for the C-section. Less than three hours was not an unreasonable amount of time for Emily to spend pushing, and the Court finds no breach in the standard of care based on the duration of the second stage of labor.

> ii.     *Failure to Use Ultrasound to Determine Position of I.A.'s Head*[12]

As discussed, CNM Speers initially determined I.A. was in the OP position, but Dr. Harmon later determined I.A. had rotated to the ROA position—one of the more ideal positions for vaginal birth. Ultimately, I.A.'s head was in an OP position

[12] Although, as discussed above, Plaintiffs' experts attempted to undermine CNM Speers' and Dr. Harmon's assessments of the presentation of I.A.'s head, noting there may have been a brow presentation, the Court finds there was no brow presentation. As such, the Court will not address Plaintiffs' argument based on breach of the standard of care related to malpresentation.

upon delivery by C-section. Plaintiffs assert Dr. Harmon should have used ultrasound to conclusively determine I.A.'s positioning given the inconsistency between CNM Speers' and Dr. Harmon's determinations based on their manual evaluations. It is undisputed Dr. Harmon did not use ultrasound while managing Emily's labor.

Both Plaintiffs' and Defendant's experts discussed what a reasonable provider should have done upon CNM Speers' initial assessment I.A. was in the OP position. Dr. Gubernick and Dr. Schifrin testified Dr. Harmon's subsequent manual assessment of ROA was inaccurate and she fell below the standard of care by not confirming her assessment with ultrasound. (Doc. 112 at 34–35; Doc. 113 at 20.) These experts admitted the OP position is not necessarily a contraindication for continued labor or vaginal delivery, as not all malpositions require C-sections. (Doc. 112 at 74; Doc. 120 at 18.)

Dr. Harmon testified regardless of whether she had determined I.A. was in the OP or ROA position, she would not have changed how she managed Emily's labor. For Defendant, Dr. Manning, who has personally performed over 200,000 ultrasounds, testified it did not fall below the standard of care for Dr. Harmon not to use one in this case. (Doc. 116 at 38–39.) Dr. Manning testified most fetuses initially determined to be in the OP position will rotate to an occiput anterior position. (*Id.* at 31, 89.) He opined a baby who persistently remains in the OP position and is ultimately delivered in that position—the case with I.A.'s delivery— would not have a higher risk of fracture or trauma. (*Id.* at 31–32.)

The Court finds Dr. Harmon did not breach the standard of care by failing to confirm her manual assessment with ultrasound, especially considering her testimony that even if I.A. had been in the OP position upon her arrival at the hospital, she would not have managed the delivery differently and the fact that all the experts agree the OP position is not a contraindication for continued labor and vaginal delivery.

*iii.*       *Use of Pitocin*[13]

Plaintiffs argue CNM Speers' administration of Pitocin breached the standard of care.  The parties presented conflicting testimony regarding the propriety of administering Pitocin to strengthen Emily's contractions.  For Plaintiffs, Dr. Gubernick opined, based on the frequency of Emily's contractions and the time it had taken for Emily to become fully dilated, giving her Pitocin was ineffective and harmful.  (Doc. 112 at 27–30.)  Plaintiffs' experts did not discuss dosage when concluding the use of Pitocin was contraindicated.  Defense experts testified the use of Pitocin was not contraindicated and did not fall below the standard of care under the circumstances.  Dr. Cook, testifying for the defense, explained CNM Speers had administered almost the minimum dose a provider would ever use.

Plaintiffs' experts' testimony regarding the improper use of Pitocin also relied on a portion of the medical records indicating a diagnosis of cephalopelvic disproportion, a childbirth complication in which the baby's head or body is too large to fit through the mother's pelvis.  (Doc. 113 at 52–53.)  Even so, Dr. Carroll testified cephalopelvic disproportion was not, in his expertise, a contraindication for use of Pitocin.  Nevertheless, assuming the Court should give this condition some weight, the medical records do not indicate at what point a provider diagnosed cephalopelvic disproportion in this case, and no testimony established this diagnosis occurred before Pitocin was administered.  Furthermore, Dr. Harmon testified cephalopelvic disproportion is more important in terms of managing future pregnancies.  The Court concludes CNM Speers' use of Pitocin to strengthen Emily's contractions was reasonable under the circumstances.

---

[13] Part of Plaintiffs' experts' testimony on the use of Pitocin relied on Plaintiffs' allegation I.A. may have been in a brow presentation.  It is undisputed that if I.A. had been in a brow presentation, use of Pitocin would be contraindicated and would constitute a breach in the standard of care.  However, as discussed above, because the Court finds there was no brow presentation, this cannot serve as the predicate for a breach based on augmenting with Pitocin.

*iv.* *C-Section*

Plaintiffs allege Dr. Harmon fell below the standard of care when performing Emily's C-section by using excessive force to dislodge I.A.'s head from Emily's pelvis. Plaintiffs argue I.A.'s head was difficult to deliver because it had become "impacted" in Emily's pelvis during her protracted, mismanaged second stage of labor—resulting in a condition referred to as "impacted fetal head"—and when Dr. Harmon broke the suction between Emily's pelvis and I.A.'s head with her delivering hand, she had to use more force than normal, causing I.A.'s skull fracture.

At trial, Dr. Harmon demonstrated the maneuver she had used to extract I.A.'s head during the C-section and the positioning of her hand and fingers. Dr. Gubernick demonstrated on the witness stand how he teaches medical residents to extract a baby's head during a C-section. Dr. Gubernick demonstrated the same maneuver Dr. Harmon demonstrated while testifying as to how she had used her delivering hand to extract I.A.'s head during the C-section. Based on this testimony, the Court finds the maneuver Dr. Harmon used to extract I.A.'s head met the standard of care.

With respect to the amount of force Dr. Harmon applied while extracting I.A.'s head, Plaintiffs argue (1) medical records show Dr. Harmon described I.A.'s delivery as "challenging"; (2) Emily sustained a tear to the uterine incision due to the amount of force Dr. Harmon had to use to extract I.A.'s head; and (3) I.A.'s head was, by definition, an "impacted fetal head," which rendered extraction by C-section difficult without the use of an additional maneuver. The Court will address these arguments in turn.

In support of the first argument, Plaintiffs point to medical records in which Dr. Harmon noted I.A.'s delivery had been "challenging." (P-3 at 17; Doc. 112 at 16; Doc. 120 at 63.) At trial, Dr. Harmon testified I.A.'s delivery had been "challenging" because of I.A.'s position and because her head was "impacted," but

the delivery was otherwise a routine C-section. Dr. Harmon explained the word "challenging" is often used in clinical notes but does not necessarily mean the delivery was unusual or traumatic. She also testified it is common for a baby's head to be somewhat "impacted" and create a seal with the mother's pelvis in an arrested descent C-section, such as Emily's. While arrested descent C-sections involving an impacted head are typically challenging, nothing in Dr. Harmon's testimony indicated this delivery was uniquely challenging such that it required use of more force than normal. The Court finds the difficulty Dr. Harmon encountered in extracting I.A.'s head from Emily's pelvis was due to I.A. being in an OP position with extension of the neck and normal challenges associated with an arrested descent C-section where the head creates a seal with the pelvis rather than I.A. having an "impacted fetal head."

Next, Plaintiffs argue Dr. Harmon's use of excessive force is evidenced by the extensive tear to Emily's uterine incision.[14] (Doc. 112 at 45–47; Doc. 113 at 42.) When challenged on this issue as an adverse witness for Plaintiffs, Dr. Harmon clearly explained tears such as the one Emily sustained are extremely common during arrested descent C-sections and are caused by the delivering hand putting strain on fragile uterine tissue. The Court finds this injury is not an indication Dr. Harmon used excessive force in extracting I.A.'s head.

Finally, Plaintiffs assert I.A. had an "impacted fetal head," a specific medical condition. (Doc. 112 at 16; Doc. 120 at 62–63.) The parties presented conflicting testimony regarding the definition of an "impacted fetal head" and the criteria upon

---

[14] Plaintiffs do not allege damages based on the tear to Emily's uterus but allege such an injury constitutes additional circumstantial evidence of the degree to which I.A.'s head was wedged in Emily's pelvis and the force required for extraction.

which this condition is diagnosed.[15] If I.A.'s head had been an "impacted fetal head," this condition would have rendered extraction by C-section extremely difficult without the use of an additional maneuver, such as a "vaginal hand maneuver," which involves "[i]ntroducing a hand into the vagina to move the [baby's] head up into the [mother's] abdomen."[16] (P-45 at 2.)

For the defense, Dr. Manning testified the term "impacted fetal head" is often used subjectively by obstetricians such that there are no strong specific diagnostic criteria. (Doc. 116 at 52.) Regardless, he testified it would not be difficult to extract a fetal head at a +1 station because the baby's head would not be deeply impacted at such a high station. (*Id.* at 53–54.) Dr. Manning ultimately concluded this case did not involve an "impacted fetal head." (*Id.* at 53.) In contrast, Dr. Gubernick testified I.A.'s head was an "impacted fetal head" based on Emily's prolonged second stage of labor, wherein I.A. was continuously pushed against Emily's pelvis. (Doc. 112 at 16.)

The Court finds Dr. Manning's testimony on this issue more credible than Dr. Gubernick's testimony implying any C-section after a prolonged second stage of labor where the baby is pushed against the pelvis during contractions would involve an impacted fetal head. Although Dr. Gubernick testified I.A. had an "impacted fetal head" at a +1 station, he never explained how he reached this conclusion other than the fact Emily had a prolonged second stage of labor. While Emily pushed for three hours prior to the C-section, I.A. never progressed further into Emily's pelvis beyond a +1 station. And, as Dr. Manning testified, +1 is a

---

[15] As a threshold matter, the terms "impacted fetal head," "deeply impacted fetal head," and "impacted head" were used interchangeably throughout trial. The Court notes, however, "impacted fetal head" is a medical term of art referring to a specific condition where the head is deeply wedged in the birth canal, making it hard to extract. (Doc. 120 at 62–63.) A baby's head can be impacted against a mother's pelvis without being an "impacted fetal head."

[16] Throughout all the testimony and arguments at trial, the vaginal hand was the only additional maneuver for which Plaintiffs propounded evidence.

relatively high station not normally associated with "impacted fetal heads." The length of Emily's second stage of labor does not indicate I.A.'s head became so deeply impacted during that time as to qualify as an "impacted fetal head."

Further, for the definition of "impacted fetal head," Plaintiffs primarily relied on an article discussing prevention and management of this condition and outlining recommendations for best practices and training. *See* "Management of impacted fetal head at cesarean" (Katie R. Cornthwaite, et al. 2022). The article notes "[t]here is no clear, consensus definition for impacted fetal head in the published literature," but "most obstetricians . . . would use 'the need for additional maneuvers' as a diagnostic criterion." (P-45 at 1.) The article defines "impacted fetal head" as "a cesarean birth where the obstetrician is unable to deliver the fetal head with their usual delivering hand, and *additional maneuvers* and/or tocolysis are required to disimpact and deliver the head." (*Id.* (emphasis added).) In other words, per Plaintiffs' own definition, whether a baby's head meets the definition of "impacted fetal head" depends on whether an additional maneuver is necessary to dislodge the baby's head from the mother's pelvis. Despite this, Plaintiffs' obstetrics experts did not assume or rely on the presence or absence of a vaginal hand maneuver in concluding I.A. had an "impacted fetal head." Dr. Gubernick testified the use of a vaginal hand maneuver, or lack thereof, did not affect his opinion I.A. had an "impacted fetal head." (Doc. 112 at 80.) Although Dr. Gubernick briefly discussed the risks associated with an impacted fetal head, he did not testify to the definition he was relying upon or how the circumstances of this case met that definition.

Regardless of Dr. Gubernick not relying on the use of a vaginal hand maneuver in concluding I.A.'s head was impacted, based on Plaintiffs' own literature, a prerequisite to the Court's finding of an impacted fetal head would be a finding of use of a vaginal hand maneuver. The medical records in this case do not mention the use of a vaginal hand maneuver. (*See generally* P-3; P-7.) Dr.

Harmon testified she was responsible for determining whether use of a vaginal hand maneuver was necessary during Emily's C-section. She testified, although she had likely set up for use of a vaginal hand maneuver, she had ultimately delivered I.A.'s head without using this maneuver. And, CNM Speers testified if a vaginal hand maneuver had occurred, it likely would have been documented in the medical records. (Doc. 117 at 26.) Dr. Eiser testified she had been in the operating room prepared to receive I.A. on the side of the drape where she could see the surgical field, she watched the C-section closely, and she did not recall a vaginal hand maneuver being used. (Doc. 132 at 24, 113–14.)

The Court finds a vaginal hand maneuver—the only maneuver Plaintiffs allege was used in this case—was not used. Although Emily testified at her deposition and at trial she remembered Dr. Harmon mentioning someone had been pushing from below, she could not testify to what actually occurred during the C-section because she had been lying on the operating table and her view was completely blocked by the drape. Similarly, although Justin's testimony described circumstances indicating he had perceived the use of a vaginal hand maneuver, he also had a limited view of the surgical field because he was standing near Emily's head. Accordingly, because no vaginal hand maneuver was used, I.A. did not have an "impacted fetal head" per Plaintiffs' own definition of the term.

In sum, Plaintiffs fail to establish by a preponderance of evidence Dr. Harmon breached the standard of care by using excessive force to dislodge I.A.'s head from Emily's pelvis during the C-section. In any event, even if I.A. had an "impacted fetal head" and the vaginal hand maneuver did occur, the Court would still find Dr. Harmon did not breach the standard of care. Testimony by Plaintiffs' own experts establishes use of the maneuver would have been consistent with the standard of care. In fact, the article Plaintiffs submitted into evidence explicitly calls for additional maneuvers such as a vaginal hand maneuver to dislodge an impacted fetal head. (P-45.) And Dr. Gubernick's testimony that I.A.'s skull

- 24 -

fracture was caused by Dr. Harmon's use of excessive force during the C-section implies she should have used a vaginal hand maneuver to mitigate such additional force. (Doc. 112 at 49–50, 100.) Were the Court to find I.A. had an "impacted fetal head," the Court would find the use of a vaginal hand maneuver appropriate.[17]

### b. Causation

As noted, on January 2, 2021, I.A. was diagnosed with a comminuted skull fracture—a fracture in which the skull bone breaks into three or more pieces—and permanent brain injury. Plaintiffs assert I.A.'s skull fracture was caused by Dr. Harmon's use of excessive force to extract I.A.'s head from Emily's pelvis during the C-section. As discussed above, the Court finds none of the care providers breached the applicable standards of care in this case. Even if such a breach had occurred, the Court finds the weight of the evidence indicates I.A.'s injuries did not occur at birth.[18] Evidence presented at trial regarding causation of I.A.'s skull fracture and brain injury can be broken down into two categories: (1) the timing of the presentation of I.A.'s symptoms and (2) the likelihood that use of force during a C-section with a delivering hand alone could have resulted in I.A.'s injuries.

Both parties presented evidence regarding the timing of I.A.'s symptoms related to her skull fracture and brain injury. Plaintiffs assert I.A.'s injuries occurred at birth and certain symptoms began presenting after discharge from the hospital. In support of their theory, Plaintiffs presented expert testimony from Dr. Glass, their primary neurology expert, that I.A. had manifested signs of a head injury from birth. (Doc. 119 at 11.) He based much of his opinion on the "swelling . . . evident at

---

[17] Under Plaintiffs' theory and definition of "impacted fetal head," the only way a breach could have occurred is if I.A. had an impacted fetal head and Dr. Harmon did not use a vaginal hand maneuver. Plaintiffs have not alleged this scenario and instead presented evidence that a vaginal hand maneuver *did* occur. The Court does not address arguments not advanced by Plaintiffs.

[18] Because the Court finds insufficient evidence to support Defendant's child abuse theory, the Court intentionally omits a discussion of I.A.'s rib and ulna fractures and testimony about nonaccidental trauma. The Court will focus its discussion on Plaintiffs' evidence and theories.

birth in the form of bruising and discoloration in the area of the frontal parietal region." (*Id.* at 11.)  Additionally, based on statements Emily made to Dr. Glass, Dr. Glass testified I.A. was "largely listless, lethargic and sleeping for very long periods of time during the day" and was "[a]wake for only 15 minutes at a time" following discharge from the hospital.  (*Id.* at 9–10.)  Although Dr. Glass recognized I.A.'s clinical symptoms were relatively mild, he explained I.A. had exhibited symptoms of a neurologic injury throughout her first three weeks of life.  However, Dr. Glass admitted on cross-examination I.A. was not encephalopathic—meaning she did not exhibit signs of brain disease or malfunction—at birth.  (*Id.* at 56.)

Dr. Mack, Plaintiffs' primary radiology expert, concluded I.A.'s skull fracture was weeks old when she came to the emergency room on January 2 because of what Dr. Mack perceived to be signs of ossification or calcification, her characterization of the edges of the fracture, and the lack of soft tissue swelling visible on brain imaging scans.  Dr. Mack also testified I.A.'s scans revealed a large blood clot near I.A.'s skull fracture and presentation of symptoms of a blood clot can be delayed after a traumatic event.  She also noted the scans showed bleeding in the functional tissue of I.A.'s brain.  She discussed a scenario in which all of these findings could be dated back to the time of birth.  Dr. Mack testified she had not reached her conclusions based on what she had learned in medical school, residency, and fellowship because the anatomy she was taught did not explain this phenomenon.  Rather, she performed additional research to reach her conclusions.  Additionally, Dr. Sims, Plaintiffs' neonatology expert, testified the evidence, viewed in retrospect, indicated I.A. had exhibited signs of birth trauma throughout the first hours and weeks of her life.  She opined if I.A. had sustained a brain injury at birth, it would explain her development of symptoms such as lethargy and feeding issues in the weeks before her hospitalization on January 2.

For the defense, Dr. Eiser, the pediatric physician treating I.A. immediately after birth, noted "significant" bruising on I.A.'s head but found no evidence of soft

- 26 -

tissue swelling prior to her discharge from the hospital. (Doc. 132 at 39, 41, 106, 110.) Almost all experts agreed an acute injury of this nature would show swelling within 48 hours. Dr. Eiser explained her use of the term "significant" to describe I.A.'s bruising does not indicate swelling or abnormally severe or large bruising but instead denotes the bruising could be clinically observed and may become clinically relevant. (*Id.* at 41.) Dr. Eiser also testified she would have obtained head imaging had she observed swelling of soft tissue on I.A.'s head. (*Id.* at 107.) She further testified, upon her examinations of I.A. immediately after and in the days following her birth, I.A. was healthy, her nervous system was functioning appropriately, her bruising was resolving, and her reflexes were intact. Dr. Eiser testified if babies have significant brain trauma or a traumatic birth, their normal neurologic reflexes would not be intact. (*Id.* at 52–53, 83.) Additionally, Dr. Hydrick testified regarding his examinations of I.A. at her well-baby visits on December 15 and 30. His notes indicate I.A. was "[m]eeting developmental milestones appropriately" and "[f]eeding, voiding, and stooling appropriately for [her] age." (D-8 at 13, 14.) Dr. Hydrick's notes also indicate Emily had reported I.A. was "feeling fine" and expressed no concerns about lethargy or listlessness. (*Id.* at 14.)

Dr. Wusthoff, Defendant's primary pediatric neurology expert and the only expert holding a board certification in epilepsy, opined I.A. was not encephalopathic at birth and her brain injury had occurred seven to ten days prior to I.A.'s presentation at the emergency room on January 2 based on imaging scans. Unlike any other experts in this case, Dr. Wusthoff discussed the timing of I.A.'s seizures as it relates to when her brain injury occurred. She testified babies with brain injuries resulting from skull fractures present with signs of neurologic injury such as seizures or encephalopathy, and such signs typically appear within 24 to 72 hours after a brain injury. As such, Dr. Wusthoff concluded I.A.'s symptoms in the days leading up to her hospitalization—including her difficulty feeding, lack of alertness or responsiveness, and eye twitching/seizures—all

indicate I.A. had sustained an acute brain injury in the week preceding her hospitalization.

Dr. Sze, Defendant's neuroradiology expert, concluded, after reviewing imaging scans, I.A.'s skull fracture had occurred within approximately ten days of January 2. (Doc. 114 at 38, 74–75.) While Dr. Sze testified he could not rule out Dr. Mack's finding of ossification, he provided another explanation for the imaging results, noting the lighter areas on the scans Dr. Mack thought were ossification could have been blood and testified a clear finding of ossification is not as consistent with the totality of the medical evidence he had reviewed. (*Id.* at 67–68, 81.) Specifically, Dr. Sze showed an MRI image and explained the bright areas around I.A.'s fracture ruled out the possibility I.A.'s injuries had occurred at birth because the brightness on the scans could only remain for a maximum of ten days following injury. (*Id.* at 31–32, 35.) Dr. Goldsmith, Defendant's neonatology expert, testified I.A.'s symptoms at the emergency room did not indicate her injuries had occurred at birth.

With respect to whether the force used to extract a baby's head during a C-section could cause the type of injuries I.A. sustained, Dr. Gubernick affirmatively testified I.A.'s skull fracture had been caused by the force of Dr. Harmon's delivering hand on her head during the C-section. He pointed to the fact that I.A. had significant bruising upon delivery in the very spot where the skull fracture was subsequently diagnosed. (Doc. 112 at 54.) Dr. Glass testified I.A.'s brain trauma and seizures were a consequence of Emily's prolonged second stage of labor and Dr. Harmon's forceful extraction of I.A. during the C-section. (Doc. 119 at 7.)

Despite having hundreds of years of collective medical experience, none of the treating providers or expert witnesses testified they had ever personally encountered a case involving a comminuted skull fracture caused during delivery by C-section. For Defendant, Dr. Carroll testified he has never personally seen or read about a case of a skull fracture caused by a C-section, even where an

impacted fetal head was involved, despite being tasked to review any abnormal outcomes in 50,000 to 60,000 births across multiple institutions. Some experts indicated there are case reports of comminuted skull fractures resulting from extraction by C-section, but the only report actually discussed at trial involved the use of instrumentation, such as a vacuum or forceps. Dr. Manning testified there has been no case of a comminuted skull fracture caused only by the force of a delivering hand. (Doc. 116 at 63–64.) He concluded, based on certain scientific principles, it is improbable an obstetrician could apply enough force on the head to cause a comminuted fracture. (*Id.* at 66–68.) Similarly, based on his review of relevant medical literature, Dr. Goldsmith concluded it would be statistically improbable for I.A.'s injuries to have occurred at birth. Notably, although testifying for Plaintiffs, Dr. Gubernick, in all his experience, could not remember or point to any case in medical literature where a skull fracture of any type had occurred during a C-section. (Doc. 112 at 92–93.) And Dr. Sims stated she has never seen the type of fracture suffered by I.A. caused by delivery without instrumentation despite her extensive experience with high-risk deliveries.

The Court finds it highly improbable that multiple healthcare providers would have missed I.A.'s skull fracture if it had been sustained at birth. Dr. Eiser examined I.A. immediately after birth and in the days following. If I.A.'s skull had been fractured at that point, Dr. Eiser would have been able to feel the fractured parietal bone during one of her three exams of I.A. (Doc. 132 at 35–38.) Further, although Dr. Glass initially testified I.A.'s head was swollen at birth in the location of the bruising, his testimony seems to conflate swelling with bruising. While it is undisputed I.A. had bruising on her head when she was born, the medical records, testimony of treating physicians, and Dr. Glass's own testimony on rebuttal indicate I.A.'s bruising was flat and showed no signs of soft tissue swelling. Even assuming normal swelling or molding of I.A.'s head immediately after birth had prevented Dr. Eiser from detecting the fracture, the fact no treating provider in the first three

weeks of I.A.'s life was able to detect the fracture weighs against Plaintiffs' theory the fracture had been present since birth. And, although Dr. Gubernick testified the bruising on I.A.'s head immediately after she was born indicated her skull fracture and brain injury had occurred at birth, he also testified "lots of babies have bruising" following normal deliveries and it is not necessarily an indication of serious injury. (Doc. 112 at 56–57.)

Moreover, the Court is unconvinced I.A.'s symptoms would have been so delayed had the injury occurred at birth. During multiple encounters with healthcare providers throughout I.A.'s first three weeks of life, Emily and Justin brought I.A. to her appointments and had the opportunity to report any concerns. Until Emily brought I.A. to the emergency room on January 2, neither she nor Justin had expressed any concerns about abnormalities on their daughter's skull aside from bruising and had not reported any symptoms suggesting she had sustained a traumatic brain injury. The concerns they did have, including difficulty feeding and high bilirubin levels, are common occurrences in newborns within their first few weeks of life. While Dr. Glass opined I.A. had exhibited symptoms of head trauma at birth, that conclusion was based on conversations he had with Emily rather than evidence in I.A.'s medical records. Overall, Dr. Glass lacked the ability to distill his medical opinions into a cohesive explanation tying I.A.'s injuries to the time of her birth. And, Dr. Mack's testimony that it is possible for the onset of symptoms to be delayed after injury was not based on what she had learned throughout the course of her medical education and is inconsistent with the type of injuries I.A. sustained in this case.

In contrast, Dr. Wusthoff's explanation of the timing of I.A.'s symptoms—and resulting conclusion the injuries occurred, at most, seven to ten days before January 2—comports with the totality of the evidence in this case. Her testimony regarding the timing of I.A.'s seizures relative to when the injury was sustained is especially persuasive considering she was the only qualified expert on that issue.

And Dr. Wusthoff's opinions based on the timing of I.A.'s symptoms are also consistent with what the imaging evidence showed. Indeed, Dr. Sze came to the same conclusion upon reviewing I.A.'s MRI. Although Plaintiffs' radiology expert, Dr. Mack, testified I.A.'s injuries could have been sustained at birth based on what she believed was calcification or ossification at the fracture site, Dr. Sze instead explained the brightness on the scan indicated the injuries could not be older than ten days and therefore what appeared to be calcification was more likely blood. For the foregoing reasons, the Court finds Plaintiffs have not shown Dr. Harmon caused I.A.'s injuries during the C-section.

## IV. CONCLUSION

Based on the totality of the evidence, and giving credence to all experts' opinions, although not equal weight, the Court finds Plaintiffs have not proven their claims by a preponderance of the evidence. Given the extensive injuries I.A. presented with on January 2, 2021, as testified to by both Plaintiffs' and Defendant's experts, it strains credulity to find that such injuries occurred at birth but did not have any medically significant manifestation for approximately twenty days. Therefore,

**IT IS ORDERED** Defendant is entitled to judgment in its favor.

**IT IS FURTHER ORDERED** the Clerk of Court shall enter final judgment accordingly.

Dated this 6th day of November, 2025.

Honorable Scott H. Rash
United States District Judge